696 A.2d 757

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. PATRICK MCNEIL, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted January 28, 1997—Decided July 16, 1997.

Humphreys, J., concurred and filed opinion.

Before Judges PRESSLER, HUMPHREYS and WECKER.

*Susan L. Reisner*, Public Defender, attorney for appellant (*Lon Taylor*, Assistant Deputy Public Defender, of counsel and on the brief).

*Clifford J. Minor*, Essex County Prosecutor, attorney for respondent (*Lesley Renee Adams*, Assistant Prosecutor, of counsel and on the letter-brief).

The opinion of the court was delivered by

WECKER, J.S.C. (temporarily assigned).

After a jury trial, defendant Patrick McNeil was convicted of second degree robbery, in violation of *N.J.S.A.* 2C: 15–1, and

sentenced to a ten-year state prison term with a five-year parole disqualifier. On appeal, defendant argues:

POINT ONE

THE REFUSAL OF THE TRIAL COURT TO GRANT DEFENDANT'S RE-QUEST FOR A JURY INSTRUCTION ON IDENTIFICATION WHERE THE SOLE DEFENSE WAS ONE OF MISIDENTIFICATION, DENIED DEFENDANT DUE PROCESS OF LAW AND A FAIR TRIAL.

POINT TWO

MS. PETROZIAN'S OUT-OF-COURT IDENTIFICATION OF DEFENDANT, WHO WAS SEATED IN A POLICE CRUISER WHEN SHE IDENTIFIED HIM AS THE ROBBER, AND IN-COURT IDENTIFICATION WERE GROSS-LY SUGGESTIVE AND UNRELIABLE, THEREBY DENYING DEFENDANT DUE PROCESS OF LAW AND A FAIR TRIAL.

POINT THREE

THE TRIAL COURT'S SUA SPONTE "FLIGHT" CHARGE, WITHOUT WARNING TO DEFENSE COUNSEL, WAS INCORRECT AND NOT SUP-PORTED BY ANY EVIDENCE, THEREBY DENYING DEFENDANT DUE PROCESS OF LAW AND A FAIR TRIAL.

POINT FOUR

THE IMPOSITION OF A MAXIMUM TEN YEAR TERM OF IMPRISON-MENT WITH A MAXIMUM DISCRETIONARY FIVE YEAR PERIOD OF PAROLE INELIGIBILITY WAS EXCESSIVE AND NOT SUPPORTED BY A PROPER ASSESSMENT OF AGGRAVATING AND MITIGATING FACTORS.

We conclude that the trial judge's refusal to give the requested jury instruction regarding the victim's identification testimony, when combined with an inapplicable flight charge and other errors in the jury instructions, was "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10–2. We therefore reverse. In light of our decision, defendant's excessive sentence argument is moot.

The facts surrounding the robbery were not disputed. Only the victim's identification of the perpetrator and descriptions of his clothing were disputed at trial. The only issue for the jury in this trial was whether the defendant was the perpetrator.

Ekaterina Petrozian was robbed in her apartment building. Petrozian, a Russian immigrant, spoke limited English. She testified with the aid of an interpreter. Shortly after 7 p.m. on December 27, 1994, she was returning to her apartment at 250 Mt. Vernon Place, one of several high-rise buildings in the Ivy Hill

Apartment complex in Newark. She entered the elevator along with several other persons, including the perpetrator. All but one person exited at the sixth or seventh floor. Petrozian noticed the remaining passenger, a black male, because she thought it unusual that he said good-bye in Russian to the other passengers.

When they were alone, he asked her for a dollar. When Petrozian said she had no money, he told her she would have to stay in the elevator. She began to scream, and when the elevator door opened at the fourteenth floor, where she lived, the perpetrator blocked her exit while he checked the hallway. She pushed past him but fell down in the hall, holding her handbag under her. The perpetrator pulled the bag free, breaking its straps, and ran down one of the stairwells. Petrozian's daughter and a neighbor heard her screams and came out to the hall.

Petrozian was particularly upset because although she had no money in her purse, it did contain her new social security card, her wedding ring, immigration papers, and a $250 bank check. Petrozian described the perpetrator to her daughter and neighbor. At trial, she said she told them that the robber was wearing a "sportive" cap and a black jacket that was a little dirty, like a workman's, that he was a black man with a strong build and that his red "sportive cap ... covered his forehead." Petrozian herself reported the description to a security guard in the basement. Her daughter repeated a description to the police outside Petrozian's presence.

Police Officer Gerald Piacenza and his partner were in a patrol car down the street when they heard a radio dispatch describing the robber wearing a "burgundy sweater, black jeans and a hat." They immediately spotted McNeil, who matched that description. Officer Piacenza got out of the car and asked McNeil where he was coming from. According to the officer, McNeil said "he was coming from his mother's house at 240 or 250 Mount Vernon Place." Piacenza testified that McNeil said either "240" or "250," but the officer could not remember which. The officers placed McNeil in the patrol car and proceeded to the rear of 250 Mount

Vernon Place, where Detective George Mendez, an off-duty officer working as a building security guard, was waiting with Petrozian. Piacenza confirmed that Petrozian banged on the window of the patrol car and accused defendant of the robbery.

Detective Mendez testified that he gave the police dispatcher a description received from another security guard, but Mendez only recalled describing an individual wearing a black jacket. When the defendant was brought back to the building, "he had a coat that was draped over his arm and thigh," and Mendez told him to put the coat on. Mendez testified that after receiving the other guard's description, he confirmed that someone fitting the description had just left the building's front entrance. However, Mendez did not repeat an actual description. He told the jury that the basements of buildings 240 and 250 were connected. At the judge's request, Mendez identified the defendant in the courtroom as the person in the patrol car and said that the defendant looked the same as when he was arrested. Mendez failed to note that defendant had grown a beard since his arrest.

After a *Wade* hearing, Petrozian was permitted to testify to her out-of-court identification of defendant. She testified that before the patrol car pulled up, she was told to wait because they had "caught someone;" she was screaming and nervous. She also testified that she "immediately" recognized defendant as the perpetrator; that it "was the same face;" and that she banged on the window of the patrol car and screamed at him, demanding her purse. Her identifications were unequivocal, both at the scene and at trial. The purse and all of its contents, except for the gold wedding ring, were later found in the building. When defendant was arrested, he had none of Petrozian's property.

■ Under the applicable standard, we find no error in the trial judge's determination that the identification procedure was not unduly suggestive, and did not taint Petrozian's in-court identification. *See Manson v. Brathwaite*, 432 *U.S.* 98, 114, 97 *S.Ct.* 2243, 2253, 53 *L.Ed.*2d 140 (1977); *Neil v. Biggers*, 409 *U.S.* 188, 93 *S.Ct.* 375, 34 *L.Ed.*2d 401 (1972); *State v. Madison*, 109

*N.J.* 223, 232, 536 *A.*2d 254 (1988). *See generally* Biunno, *Current N.J.Rules of Evidence,* Comment 3 to *N.J.R.E.* 803(a)(3). One-on-one "show-up" identifications, in which a suspect is apprehended promptly after a crime and brought to the victim, are not prohibited. *State v. Wilkerson,* 60 *N.J.* 452, 461–62, 291 *A.*2d 8 (1972); *State v. Brent,* 265 *N.J.Super.* 577, 584, 628 *A.*2d 372 (App.Div. 1993), *rev'd on other grds,* 137 *N.J.* 107, 644 *A.*2d 583 (1994).

The circumstances that justify admitting the out-of-court identification do not justify refusing a jury charge on identification.[1] The cases addressing an omitted identification charge demonstrate that whether the omission requires reversal is highly fact-sensitive. *See State v. Green,* 86 *N.J.* 281, 430 *A.*2d 914 (1981); *State v. Salaam,* 225 *N.J.Super.* 66, 541 *A.*2d 1075 (App. Div.1988); *State v. Frey,* 194 *N.J.Super.* ·326, 476 *A.*2d 884 (App. Div.1984).

In *State v. Green, supra,* the Supreme Court held that where, as here, identification was the "key issue" and the "major, if not the sole, thrust of the defense," and in view of the

> potential danger of mistaken eyewitness identification ... the defendant had a right to expect that the appropriate guidelines would be given, focusing the jury's attention on how to analyze and consider that factual issue with regard to the trustworthiness of [the] in-court identification.
>
> [86 *N.J.* at 291–92, 430 *A.*2d 914.]

In *Green* the only evidence connecting the defendant to the crime was the victim's identification after a chance street encounter months after the crime. The judge did not give the identification charge, and the conviction was reversed for plain error. We must decide whether Petrozian's prompt identification, along with limited corroborative evidence, distinguishes this case from *Green.* Two Appellate Division decisions invite comparison. In *State v.*

---

[1] The Model Jury Charge, promulgated 11/16/90, includes a cautionary note that "a model charge fit for universal application is impossible of formulation ... [and that the] suggested charge is intended as a tool ... [to be used with] some forethought" and with consideration to "briefly reviewing the conflicting contentions of the State and the defendant[ ] ..."

*Frey, supra,* where the victim of a sexual assault was the sole eyewitness and the defendant denied involvement, we followed *Green* and held that failure to charge the jury on identification was plain error. In *State v. Salaam, supra,* we distinguished *Green* and held that failure to give the identification charge was not plain error where "corroborative evidence . . . rendered the issue of identification far less compelling than it was in *Green* and *Frey." Id.* at 70, 541 *A.*2d 1075.

Identification was the only issue in this trial. The charge was therefore required under *Green.* The question is whether omitting the charge was harmful error that requires reversal, as in *Green* and *Frey,* or whether it was harmless error, as in *Salaam.* In *Green, Frey,* and *Salaam,* as in the case before us, the victim's out-of-court identification was the only direct evidence that the defendant was the perpetrator. The critical distinction between *Green* and *Frey* on the one hand and *Salaam* on the other is the presence of undisputed corroborating evidence in *Salaam* and the absence of corroborating evidence in *Green* and *Frey.* In *Salaam* the victim testified that the robber pointed a pistol at her, and that she gave him less than seventy-five dollars, including a large number of singles. When Salaam was apprehended one-half mile from the store, within twenty minutes of the incident, he had in his possession a toy pistol and sixty-two dollars in currency, including twenty-seven one-dollar bills. These uncontradicted corroborative facts convinced the court that "[t]he trial court's failure to include a specific charge on identification did not constitute error, let alone plain error." *State v. Salaam, supra,* 225 *N.J.Super.* at 69, 541 *A.*2d 1075.

There is some corroborative evidence against McNeil, including testimony about a red knit ski cap, a black coat or jacket, and a basement connection between 240 and 250 Mt. Vernon Place. That evidence, however, provides substantially weaker corroboration of the robber's identity than the evidence cited in *Salaam.* The corroboration is weaker because the State relies on disputed facts for corroboration that McNeil is the robber, whereas in

*Salaam* the corroborating facts were undisputed. There was contradictory testimony about whether McNeil matched Petrozian's initial description of the robber. She gave that description in Russian to her daughter who telephoned police. Petrozian herself gave a description in mixed English and Russian to a building security guard, who transmitted it through another guard to the police. A police dispatcher broadcast a description by radio. At trial, Petrozian described the robber as a black man with a strong build, wearing a black workman's jacket and a "sportive" cap. After a leading question from the prosecutor, she described the robber's hat as a red knit ski cap. Piacenza, the arresting officer, testified that the clothing description he heard over the radio was a burgundy sweater, black jeans, and a hat, and that McNeil's clothing matched that description. Officer Piacenza did not describe a black coat or jacket either in the broadcast description or in his own observation of the defendant. Nor did he mention height, weight, build, or race in the broadcast or in his own description. The only other evidence of a red cap was in Piacenza's partner's written report, prepared sometime after the arrest. While the evidence was sufficient for the jury to conclude that the descriptions matched, the match was hardly as plain as that in *Salaam*. On this evidence, the jury certainly could have concluded that the descriptions did not match.

The corroboration here is also weaker than in *Salaam* because evidence that the State relied on for corroboration permitted exculpatory as well as inculpatory inferences. When asked why he was on the street, McNeil told an officer that his mother lived on the fourteenth floor of a specific Ivy Hill building. Her address was stipulated. The jury could have inferred from McNeil's statement, along with the fact that his mother's building was connected to the victim's building, that McNeil had access to the elevator where the incident began. But the jury could also have inferred an entirely innocent explanation for McNeil's presence near the scene of the crime.

The presence of some corroborating evidence distinguishes this case from *Green* and *Frey*. However, the weakness of that evidence also distinguishes this case from *Salaam*. McNeil was entitled to have the judge explicitly instruct the jury to consider those recognized factors described in the model charge that could have affected Petrozian's in-court and out-of-court identifications. Moreover, McNeil was entitled to have the judge warn the jury that Petrozian's in-court identification could have been influenced by having seen him in the police car, rather than by having seen him in the elevator.

We need not decide whether the omitted identification charge alone requires reversal because we are persuaded that the cumulative effect of that omission, along with other errors in the jury charge, requires reversal. *See State v. Middleton*, 299 *N.J.Super.* 22, 690 *A.*2d 623 (App.Div.1997) (reversing conviction for cumulative errors, including both failure to give the identification charge and refusal to allow read-back of identification testimony). *See also State v. Jones*, 224 *N.J.Super.* 527, 540 *A.*2d 1330 (App.Div. 1988) (at retrial required by erroneous polygraph charge, omitted identification charge is also to be given).

■ The potential prejudice of the omitted identification charge increased when the jury received a flight charge that was totally inapplicable to the evidence. That charge referred to the perpetrator leaving the scene of the crime as evidence that he was conscious of guilt. We know the perpetrator was conscious of his guilt; the jury had to decide whether this defendant was the perpetrator. Defendant denied that he was the perpetrator, and there was evidence by way of the stipulation and defendant's statement to explain his presence on the street near the scene of the crime. Nevertheless, the judge said:

> There has been some testimony in this case from which you may infer that *the Defendant* fled shortly after the alleged commission of the crime.
>
> [emphasis added.]

That instruction could only have suggested to the jury that the judge believed defendant to be the perpetrator.

■ Another portion of the charge, not raised by defendant, contributed to the potential for an unjust result. While instructing the jury with respect to the credibility of the witnesses, the judge told the jurors:

> You may take into account, also, Ladies and Gentlemen, the frankness of the witness, the general demeanor in the courtroom, the ability of the witness to make observations and to relate them here in the relative calm of a courtroom setting and *a reluctance or willingness to testify.*
>
> [emphasis added.]

Willingness or reluctance to answer particular questions, especially on cross-examination, are appropriate considerations with respect to credibility. But willingness "to testify," where the defendant exercised his constitutional right not to do so and requested the appropriate jury charge, is not. Specific words or phrases should not be evaluated in isolation, and the charge should be considered as a whole. *State v. Jordan,* 147 *N.J.* 409, 422, 688 A.2d 97 (1997). In context, however, the above-quoted words had the potential to neutralize a critical jury instruction—the instruction not to draw an adverse inference from defendant's exercise of his constitutional right not to testify.

■ Two other errors in the jury instructions, neither of which was raised by defendant, nevertheless contribute to the prejudice that results from the missing identification charge. Defendant does not argue on this appeal that the court erred in failing to give an adequate *Kociolek* [2] charge, and we do not address that issue as

---

[2] *State v. Kociolek,* 23 *N.J.* 400, 421, 129 A.2d 417 (1957). *Kociolek* and *Jordan* require that the jury not only be cautioned about relying on a defendant's oral, out-of-court statement. The Supreme Court has told us that the jury should be told the reasons: "the generally recognized risk of inaccuracy and error in communication and recollection of verbal utterances and misconstruction by the hearer ... [the] inherent weaknesses in this character of testimony: faulty memory, the danger of error in understanding and repetition." *Jordan,* 147 *N.J.* at 420, 688 A.2d 97, quoting and reiterating the reasoning of *Kociolek,* 23 *N.J.* at 421, 129 A.2d 417. The judge here told the jury only the following:

> There was testimony in this case of certain oral statements allegedly made by the Defendant at the scene that was never committed to writing. Such

a separate ground for reversal. But the inadequacy of that charge magnifies the prejudicial impact of denying the identification charge. The complete *Kociolek* charge was requested in connection with defendant's oral statement on the street, which Officer Piacenza admitted he could not repeat accurately.

■ The State offered Officer Piacenza's version of defendant's response when the officer stopped him and asked where he was coming from. The officer testified that the defendant said he was coming from his mother's building on Mt. Vernon Place, where she lived on the fourteenth floor; the officer could not recall whether defendant said the number "240" or "250." Although there was a stipulation that defendant's mother lived on the fourteenth floor of number 240 Mt. Vernon Place, defendant did not offer the stipulation until the end of the day of testimony. The jury was not apprised of the stipulation until the next day, and was thus left overnight with the impression either that defendant's statement was the only evidence of his mother's address, or that he lied and said she lived at 250. The logical inference from either impression was that he was covering up his knowing involvement in this crime. Another error added to the impact of the omitted identification charge. That was the judge's incorrect advice to the jury that the stipulation "is to be taken the same as if it were presented from the witness stand." There is no assurance that the jury understood that defendant's mother's residence at number 240 was an agreed fact and not merely one witness' testimony.

■ Defendant's identification was further prejudiced when the judge asked Detective Mendez if he saw in the courtroom the person he had seen in the patrol car. Mendez pointed to McNeil. Since there was no dispute that McNeil was the person in the car, this demonstration was legally irrelevant. Coming at the request of the judge as it did, the demonstration could only have suggested that Mendez was identifying the defendant as the perpetrator.

---

verbal testimony is to be received with caution. You should receive, weigh and consider such evidence carefully.

The Assistant Prosecutor's summation added to the potential harm resulting from the lack of an instruction on identification evidence. The prosecutor gave the jury a distorted version of the model jury instruction without objection or correction from the court. Emphasizing the centrality of Petrozian's identification, the prosecutor told the jury:

> And this case, for the most part, rises and falls upon Mrs. Petrozian's testimony. So consider what she said very carefully. Ask yourselves how accurate was she in her description and then ask yourselves how accurate is anyone in their description? ... [w]hy are we going to hold Mrs. Petrozian to a higher standard than we would hold ourselves to when someone describes another person to you and you hear that description and you see that person, you would say what kind of picture do you get in your mind as they're telling you what that person looks like and how closely does it fit when you actually meet the person who was just described? So I'm asking you to consider her positive identification, not her description.

While the prosecutor accurately focused the jury's attention on Petrozian's identifications of McNeil, the prosecutor also minimized the jury's obligation to consider the accuracy of both the in-court and the out-of-court identifications. In light of the prosecutor's mistaken argument, the omitted identification charge had an even greater potential for creating an unjust result.

The Supreme Court recently affirmed a conviction for murder, attempted murder, armed robbery, and weapons possession, despite the trial judge's failure to give two required jury charges. *State v. Jordan,* 147 *N.J.* 409, 688 *A.*2d 97 (1997). The Court reiterated that both the *Hampton* [3] and *Kociolek* charges were required, *id.* at 428, 129 *A.*2d 417, but held that the failure to give those charges was subject to the plain error rule, and neither omission was plain error. *Id.* at 426, 129 *A.*2d 417. We need not address whether the failure to give the identification charge here was plain error because the enumerated errors together created a

---

[3] *State v. Hampton,* 61 *N.J.* 250, 294 *A.*2d 23 (1972) (requiring that when a defendant's statement is ruled admissible after a hearing pursuant to *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966)), the judge (1) must instruct the jury to determine whether the statement was voluntary and to consider the statement only if it is found voluntary; and (2) must not tell the jury that the court has already found the statement sufficiently voluntary to allow it into evidence.

potential for an unjust result that requires reversal. On retrial, an appropriate identification charge shall be given.

Reversed and remanded for a new trial.

HUMPHREYS, J.A.D. (concurring).

I concur in the reversal and remand. The judge's refusal to give an identification charge in a case based almost solely on identification cannot be upheld under *State v. Green*, 86 *N.J.* 281, 291, 430 *A.*2d 914 (1981). Identification was in this case, as it was in *Green*, "a fundamental and essential trial issue." *Ibid.* Consequently, the jury must be given a proper legal instruction on that issue. *Id.* at 292, 430 *A.*2d 914. The refusal to give such an instruction in a case in which there was no other substantial evidence of the defendant's guilt mandates a reversal of the conviction. *Ibid.*

The other "errors" perceived by my colleagues are not significant enough to warrant reversal of a criminal conviction, especially those matters not raised by the defendant either at trial or on appeal. *See State v. Macon*, 57 *N.J.* 325, 333, 273 *A.*2d 1 (1971) (Weintraub, C.J.) ("It may be inferred from the failure to object that in the context of the trial, the error was actually of no moment."). This is not a case in which cumulative errors resulted in an unfair trial. This is simply a trial in which the judge refused to give the jury a crucial instruction on the legal principles which must govern the jury's decision. Such a conviction cannot be sustained.